# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CIVIC ASSOCIATION OF SURREY PARK, | ) ) ) | |
| Petitioner, | ) ) ) | C.A. No. 2019-0961-SEM |
| v. | ) ) | |
| ROBERT RIEGEL and ERIN RIEGEL, | ) ) | |
| Respondents. | ) | |

## MASTER'S FINAL POST-TRIAL REPORT

Final Report: May 19, 2022
Draft Report: December 30, 2021
Date Submitted: September 24, 2021

Thomas C. Marconi, LOSCO & MARCONI PA, Wilmington, Delaware; *Counsel for Petitioner.*

Richard L. Abbott, ABBOTT LAW FIRM, Hockessin, Delaware; *Counsel for Respondents.*

**MOLINA, M.**

The Civic Association of Surrey Park contends certain homeowners constructed a large shed on their property without approval, which is not suitable, desirable, or in harmony with the neighborhood and negatively affects the outlook of a neighboring property. The homeowners argue the association lacks standing to enforce the restrictions, failed to issue a final decision on their plans, acquiesced to earlier violations, and rejected the homeowners' plans based on restrictions that are not enforceable or were arbitrarily applied.

For the reasons explained herein, I find the association failed to prove standing to enforce the restrictions. In the interest of providing a complete record for exception purposes, I also address the remaining issues and find the dispute is ripe, widespread acquiescence has not been established, and the restrictions relied on by the association are unenforceable and were arbitrarily applied to the homeowners' plans. I recommend judgment be entered for the homeowners.

## I.    Background[1]

This is a dispute regarding the enforcement of deed restrictions by the Civic Association of Surrey Park ("CASP") against Robert Riegel and Erin Riegel, Surrey Park residents and owners of 200 Saddler Lane, Wilmington, Delaware (the

---

[1] The facts in this report reflect my findings based on the record developed at trial on June 29, 2021, and July 21, 2021. *See* Docket Items ("D.I.") 69, 71. I grant the evidence the weight and credibility I find it deserves. Citations to the trial transcripts are in the form "Tr. #." CASP's exhibits are cited as "PX __." The Riegels' exhibits are cited as "RX __."

1

"Property").[2]  Surrey Park is a residential subdivision with approximately 221 single-family homes in Brandywine Hundred, New Castle County, Delaware.[3]  In a "nice mix," Surrey Park features a variety of architectural styles, including Cape Cod, French Colonial, Dutch Colonial, ranch, and contemporary.[4]

## A.  The Early Years

Crompton Development Corporation (the "Corporation") developed Surrey Park in the 1960s.[5]  The Corporation recorded a declaration of restrictions covering Surrey Park on June 19, 1964 (the "Declaration").[6]  In pertinent part, the Declaration requires homeowners to submit plans for approval before building any structures on property within Surrey Park.[7]  The plans and specifications must show "the nature, kind, shape, height, materials, floor plans, color scheme, location or approximate cost of such structure, the location of driveways, and the grading of the parcel of land to be built upon[.]"[8]  Through the Declaration, the Corporation has

> the right to refuse to approve any such plan or specifications or grading plan, which are not suitable or desirable, in their opinion, for aesthetic or other reasons; and in so passing upon such plans . . . [the Corporation

---

[2] *See* RX 3.

[3] PX 1; Tr. 25:16-22.

[4] Tr. 25:22-23, 238:6-16, 267:9.  The homes within Surrey Park also feature a variety of facades, from brick to cedar to vinyl siding.  Tr. 25:23-24.

[5] PX 1.

[6] *Id.*

[7] *Id.*

[8] *Id.*

has] the right to take into consideration the suitability of the proposed building or other structure and of the materials of which it is to be built, to the site upon which is proposed to erect the same, the harmony thereof with the surroundings and the effect of the building or other structure, as planned, on the outlook for the adjacent or neighboring property.[9]

The Declaration further provides the Corporation with the power to enforce the restrictions and assign its rights and powers.[10]

The Corporation was dissolved on January 12, 1971.[11] At the time of dissolution, the Corporation had two stockholders, Pierce K. Crompton, Jr. and Letitia M. Crompton (the "Cromptons").[12] More than four (4) years after dissolution, the Cromptons executed an assignment of rights, powers, titles, estates, duties and obligations under restrictions covering Surrey Park to CASP (the "Assignment").[13] The Assignment provides the Corporation's rights under the Declaration were transferred to its stockholders at the time of dissolution and the Cromptons were thereby transferring their acquired rights to CASP.[14]

---

[9] *Id.*

[10] *Id.*

[11] RX 9.

[12] PX 2.

[13] *Id.*

[14] *Id.*

## B. CASP's Reign

CASP is a non-profit, non-stock corporation, and the civic association for the community of Surrey Park.[15] It is "an all-volunteer organization"[16] established "to promote the general welfare and the community activities of Surrey Park; to enforce deed restrictions and governmental regulations; to aid in protection of property values; and to disseminate information of community interest."[17]

CASP is governed by its bylaws and constitution (the "Operating Documents").[18] Under the Operating Documents, CASP manages its affairs through a board of directors (the "Board"), with the president of the Board empowered to appoint district representatives, committees, and committee chairpersons.[19]

CASP enforces the restrictions in the Declaration through its deed restriction committee (the "Committee").[20] Residents of Surrey Park are advised to submit

---

[15] RX 35.

[16] Tr. 27:17.

[17] RX 38.

[18] RX 37-38.

[19] RX 38. The Board consists of four (4) officers and fourteen (14) district representatives. *Id.*; Tr. 26:11-20.

[20] *See* RX 43-45; Tr. 29:24-30:14, 43:13-22. The Committee is "typically a committee of three," but it "can be a more difficult position to fill because it requires more ongoing work and it's more *ad hoc*." Tr. 44:1-6. The Riegels argue in their exceptions to my final report that "[t]he undisputed evidence established that there was no such thing as the Committee[.]" D.I. 88, p.5. I disagree. I find the testimony from CASP's current and former officers was credible and, coupled with the documentation showing committee action (*see, e.g.*, RX19), is sufficient to support the existence and role of the Committee.

4

plans for new improvements, including fences and sheds, to the Committee for approval.[21]  CASP maintains information about the restrictions on its website (launched in 2016) and in the civic association directory, which is distributed every few years and to new residents.[22]

Two CASP witnesses testified that CASP has consistently enforced the restrictions in the Declaration: Randall Hirt and Timothy Michael Laur.[23]  Mr. Hirt moved to Surrey Park when he was 11 or 12 years old and lived there through high school, before moving away.[24]  In 2012, Mr. Hirt returned, buying and moving back into his childhood home.[25]  After returning home, Mr. Hirt served as CASP's

---

[21] PX 5; Tr. 31:9-11.

[22] Tr. 30:18-32:9, 41:23-42:21.

[23] Tr. 29:4-7, 440:11-442:10.  As a longtime resident, Walter Randall Williamson largely agreed. Tr. 228:8-14.  Mr. Laur explained, in his capacity as then-president of CASP, "what the board is tasked with as one of the defined obligations, is to enforce the deed restrictions to maintain the character of the neighborhood, the appeal of the neighborhood, the attractiveness of the neighborhood, to make sure people maintain their properties and they don't infringe upon their neighbors, et cetera."  Tr. 155:22-155:5. *See also* Tr. 440:11-20. Mr. Hirt offered a personal anecdote in support: when Mr. Hirt was a child, in 1973 or 1974, a tree fort he and a friend constructed was taken down after others complained to CASP. Tr. 30:3-13.

[24] Tr. 25:11-13.

[25] Tr. 24:18-19.  Mr. Hirt's home is next door to one of the Riegels' neighbors, the Williamsons. Tr. 24:23-24.  Mr. Hirt testified that he has known the Williamsons for decades and they have a friendly relationship. Tr. 60:9-61:5.  Mr. Williamson testified that he and his wife have lived in Surrey Park since 1981. Tr. 227:9-13.

president from 2015-2017.[26]  CASP's second witness, Mr. Laur, moved to Surrey

Park in 2009 and served as president of CASP from 2018 through (at least) trial.[27]

Mr. Laur, however, admitted that CASP's recordkeeping is lacking.[28]

Unfortunately, during Mr. Laur's time with CASP, CASP did not maintain a central

repository of records.[29]  Thus, when it came time to collect records for this litigation,

CASP needed to contact and collect from previous members of the Committee and,

in the process, CASP learned some records were inadvertently disposed of without

permission from CASP or the Committee.[30]

### C.    The Riegels

The Riegels purchased the Property, a two-story Dutch Colonial, on

November 6, 2015.[31]  The deed to the Property provided notice to the Riegels that

---

[26] Tr. 27:4-5.

[27] Tr. 107:12-13, 108:2-4.  Mr. Laur testified he was not planning to seek reappointment as president at CASP's annual meeting scheduled for October 2021.  Tr. 452:6-8.

[28] Tr. 442:15-446:17.

[29] Tr. 443:1-5.

[30] Tr. 442:15-443:9, 446:5-17.  The Riegels have latched onto the dearth of records as proof that multiple structures within Surrey Park were constructed without prior approval. Mr. Riegel conducted a personal survey of various sheds and additions throughout Surrey Park by walking around the neighborhood and taking pictures of any structures that he noticed. *See* RX 11-12; Tr. 343:17-20.  He then reviewed the documents produced by CASP to see if the records showed written approval of these structures. Tr. 332:13-17.  Many structures were unsupported.

[31] RX 3; Tr. 267:9.

the Property is subject to all restrictions.[32] The Riegels were also reminded of the restrictions by Mr. Hirt when they began building a fence in December 2015.[33] The Riegels did not submit a plan to CASP or the Committee for approval before they began construction. Mr. Hirt, then-president of CASP, noticed the construction and "walked over and suggested that – made sure [the Riegels] were aware that there were deed restrictions in Surrey Park and requested that they submit an application, the plot plan."[34] The Riegels complied and the fence was ultimately approved.[35]

By the fall of 2017, the Riegels were considering constructing a shed in their backyard for storage.[36] Mr. Riegel spoke with Mr. Hirt about the standard process and was, again, advised that he would need to submit a plan to the Committee for pre-approval.[37] Mr. Hirt followed up their conversation with an email on October 2,

---

[32] RX 3 (expressly subject to "ALL covenants, conditions, restrictions and easements of record"). Yet Mr. Riegel testified that their settlement attorney advised him: "As long as anyone else has it, you can have it. You don't have to go through these process loads." Tr. 253:23-254:5.

[33] Apparently relying on their settlement attorneys' advice, before starting construction, the Riegels drove throughout Surrey Park and observed that other homes had split rail fences. Tr. 253:16-17, 254:6-9.

[34] Tr. 48:21-24.

[35] Tr. 255:21-256:2, 49:3-4, 101:9-23, 261:1-21. Although a plan was ultimately submitted, Mr. Riegel testified he does not remember Mr. Hirt emphasizing the preapproval requirement. Tr. 255:16-20, 255:5-6, 27:4-5. Rather, Mr. Riegel contends Mr. Hirt instructed him to check with his neighbors and ensure compliance with the county code. See also Tr. 263:13-22, 452:6-10. Mr. Riegel's selective memory was not persuasive.

[36] Tr. 262:21-263:3.

[37] Tr. 45:21-46:5.

7

2017, which included links to CASP's deed restrictions, CASP's "Fences & Sheds Guidelines", and the New Castle County Code.[38]  Although Mr. Riegel responded "[t]hank you" to the email, he "missed the part" where Mr. Hirt directed him to apply to the Committee for approval before beginning construction.[39]

But the Riegels did not move forward with their shed (the "Structure") until 2019.[40]  It was Mr. Riegel's father, Warren F. Riegel, who reignited their interest. While driving on Route 40, Mr. Warren Riegel saw a shed that matched the Property, toured the building, and took pictures to share with his son.[41]  Mr. Riegel was inspired by the design and located similar plans online that he modified to fit his family's needs.[42]

Despite his earlier experience with the fence and the 2017 reminder, Mr. Riegel testified that he believed he could begin construction of the Structure after consulting the New Castle County Code and his neighbors.[43]  Mr. Riegel endeavored

---

[38] PX 6.  Mr. Hirt confirmed his reference to shed guidelines was inaccurate, as there were no shed guidelines on the website at that time.  Tr. 80:18-23.  But Mr. Hirt contends there was "information on sheds on the website." *Id.*  Precisely what information there was is unclear.

[39] PX 6; Tr. 402:6-403:8.  This is another example of Mr. Riegel's selective memory. I do not find his professed ignorance credible.

[40] Tr. 264:11-13.

[41] Tr. 427:11-23.

[42] Tr. 251:19-252:1, 428:9, 428:14-17, 266:18-267:9.

[43] Tr. 403:3-8.  Mr. Riegel knew, or should have known, that deed restrictions ran with the land, binding the Property. He was also reminded by Mr. Hirt, at least twice, that pre-approval was required. Again, I find Mr. Riegel's testimony that he was unaware that he

to do both. The first was easy—per Mr. Riegel, the Structure did not require a building permit, because it would be less than 200 square feet.[44] The second was a bit more challenging. One set of neighbors, the Williamsons, raised concerns about the size of the Structure; in particular, its height.[45] Mr. Riegel and Mr. Williamson disagree about whether the Williamsons were provided with specifications or a general description that the Structure would be "high."[46] They also disagree about the nature of their conversation, with Mr. Riegel testifying he sought the Williamsons' approval and Mr. Williamson testifying that Mr. Riegel told them he already had all the necessary approvals and asked nothing of them.[47]

Thereafter, in April 2019, without applying to and getting the approval of CASP or the Committee, the Riegels began construction of the Structure.[48] By May,

---

needed to submit a plan to CASP or the Committee implausible; rather, I find Mr. Riegel affirmatively decided not to submit plans before beginning construction of the fence or the Structure.

[44] Tr. 264:14-265:19.

[45] Tr. 267:19-268:4. Another neighbor of the Riegels, Lawrence Francis Fetes, testified that he had no concerns about the Structure and was happy with the work the Riegels have done to the Property. *See, e.g.*, Tr. 217:17-20. *See also* Tr. 189:23-190:10 (Laur) (testifying that Mr. Fetes and the Margolins, the Riegels' other neighbors, did not complain about the Structure).

[46] *Compare* Tr. 231:14-20 *with* 267:15-268:4.

[47] *Compare* Tr. 232:9-12 *with* Tr. 404:3-14. It is unfortunate that the relationship between the Riegels and the Williamsons deteriorated. Both Mr. Williamson and Mr. Riegel testified that their relationship started well, with mutual friendship and neighborly assistance. *See, e.g.*, Tr. 229:9-13.

[48] Tr. 273:14-17.

9

the Riegels had completed the base of the Structure.[49] The Riegels continued building the Structure, including installing the roof trusses and most of the plywood for the roof, without approval or objection for nearly two (2) months.[50]

On July 27, 2019, when the Structure was approximately eighty (80) percent complete, trouble started brewing.[51] On that day, Mr. Hirt and Mrs. Williamson approached Mr. Riegel in his yard to discuss their concerns about the Structure.[52] Their conversation grew contentious. Mr. Hirt called the Structure "obnoxious" and Mr. Riegel, having planned and built the Structure himself, understandably, took offence.[53] When pressed by Mr. Hirt about whether Mr. Riegel had approval, Mr. Riegel argued "he had all the approvals that he needed."[54]

Three days later, Mr. Laur, as president of CASP, emailed Mr. Riegel, informing him that he must stop construction of the Structure and submit plans for CASP's review and approval or else he would be violating the deed restrictions.[55] When they spoke about CASP's concerns, Mr. Laur advised Mr. Riegel to submit

---

[49] Tr. 273:18-274:2.

[50] Tr. 275:19-276:16.

[51] Tr. 275:8-22.

[52] Tr. 275:7-10, 275:21-22.

[53] Tr. 58:1-9, 278:15-22.

[54] Tr. 58:8-9, 278:5-9.

[55] RX 4.

the application and assured him that CASP would treat him fairly.[56] But Mr. Riegel voiced concerns about Mr. Hirt's involvement and alleged discrimination.[57] Per Mr. Laur, Mr. Riegel was insistent that he was building the Structure no matter what and would go to court if needed.[58]

Nevertheless, Mr. Riegel did submit an application and plans for the Structure to CASP, through Mr. Laur, shortly thereafter.[59] Mr. Laur sent the Riegels' application and plans to the Committee for review.[60] After review, including an in-person meeting with Mr. Riegel at the Property, the Committee requested the Board meet to discuss the application further.[61] At a July meeting, with a quorum present, the Board voted against approving the Riegels' plans.[62] Mr. Laur testified that the

---

[56] *See* Tr. 134:14-135:23.

[57] *Id.*; Tr. 408:22-409:12. *See also* Tr. 279:9-12 (Riegel) (explaining he believes Mr. Hirt came after him about his fence, then his Christmas blowups, then his shed). The Riegels argue that Mr. Hirt was involved in the review and rejection process, despite no longer being an officer of CASP or a member of the Committee. Mr. Hirt was copied on certain emails and does appear to have taken a special interest in the issue, but CASP has submitted sufficient evidence that a decision was made on each application by the Committee or the Board.

[58] *See* Tr. 134:14-135:3.

[59] RX 17; Tr. 138:20-22.

[60] Tr. 147:5-7, 109:18-21. Christian Lehr was the head of the Committee at that time, with fellow members Mike Riches and Kevin Wolpert. Tr. 87:16-17, 109:22-110:7.

[61] Tr. 140:10-16, 141:11-24. Mr. Riegel testified that Mr. Lehr and Mr. Riches went to the Property on or around August 8, 2019 to view the Structure. Tr. 351:4-353:8.

[62] Tr. 150:4-11, 171:4-24. I find Mr. Laur's testimony that there was a quorum credible and attribute his inability to identify the breakdown of officers and representatives in attendance to the passage of time between the meeting and trial. Tr. 149:15-20.

11

Board determined the plans were unacceptable because the Structure "was massive in structure, set a precedent, it was imposing and intrusive to the neighbors, the direct neighbors, primarily the Williamsons. . . . Nothing like this had been done before."[63]

After the meeting, on August 19, 2019, CASP wrote to the Riegels explaining CASP's refusal to approve the plan.[64] The letterhead read "Civic Association of Surrey Park – Deed Restriction Committee Notice of Decision," it was signed by Mr. Lehr and Mr. Laur, and provided four (4) reasons for refusal:

> 1. No building permit has been procured. According to CASP's legal counsel, a building permit is required for the building by New Castle County for a number of reasons; including because the height of the building will be more than a single story;
>
> 2. The large two-story building is undesirable, and is not suitable for the site and its surroundings. More specifically, the two-story building you propose is much larger and much taller than any other accessory building in Surrey Park. As such, it upsets the long-maintained aesthetic balance which has long existed in the neighborhood;
>
> 3. The building's proximity to the property line negatively impacts the outlook of adjacent and neighboring properties; and
>
> 4. The building is otherwise not in harmony with the neighborhood and approval of your plans would set an inappropriate precedent for the accessory buildings in Surrey Park.[65]

---

[63] Tr. 113:4-21.

[64] RX 19.

[65] *Id.*

After this initial rejection, Mr. Riegel revised the plans, adding a roof over the Structure's deck.[66]  Mr. Riegel submitted the revised plans for the Structure to the New Castle County Department of Land Use, which approved the plans on August 30, 2019.[67]  Mr. Riegel then submitted the revised plans to CASP.[68]

On September 9, 2019, CASP sent the Riegels a letter refusing to approve the revised plans, signed again by Mr. Lehr and Mr. Laur and on the same letterhead.[69] The second rejection letter provided three reasons for non-approval:

> 1. The building is not suitable or desirable in that at 20 feet high (including the concrete footing) it is significantly taller than any other accessory structure in Surrey Park.
>
> 2. The size and location of the building also negatively impact the outlook of the neighboring property. Specifically, the structure is clearly visible from the inside of their home as well as from the backyard. Moreover, it is fair to say that the structure is the dominant view from the rear rooms of the home, with the 2nd floor of the structure being particularly conspicuous.

---

[66] Tr. 291:1-4.  Mr. Riegel testified that he added the porch to make the Structure large enough to require a permit and because he believed it would be more aesthetically pleasing. Tr. 291:6-11.

[67] Tr. 285:12-286:13; RX 16.

[68] Tr. 290:12-24.

[69] RX 5.  How the second rejection came to be is less clear than the first.  Mr. Laur testified that the Board met in August and September and voted electronically to reject the revised plans before the Committee issued the second rejection letter. Tr. 167:8-19, 172:14-23. But, despite Mr. Laur's admission that minutes should confirm such meeting and e-vote, no such minutes or other records were produced. Tr. 167:23-168:6.

13

3. The building is otherwise not in harmony with the neighborhood due to the aforementioned reasons and approval of your plans will set an inappropriate precedent for accessory buildings in Surrey Park.[70]

The letter did provide the Riegels with a compromise: CASP "would be willing to accept the building in its current location, with an overall total height off of the ground of 12 total feet or less."[71]  Other than this compromise, the second rejection letter demanded the Riegels cease further construction.[72]

Despite the second rejection, and in defiance of CASP's demand to "cease further construction of the building," the Riegels completed construction of the Structure.[73]  Mr. Riegel testified that he did so in the interests of safety and preserving the work that had already been done.[74] As completed, the Structure

---

[70] RX 5.

[71] *Id.*  Mr. Riegel testified that he would not have reduced the height but there were other options they would have considered such as moving the Structure or putting up trees.  Tr. 421:23-422:8.

[72] Mr. Laur testified that he penned the second rejection letter and that "suitable or desirable" meant: "The presence of that building is not appropriate for the small plot of land it is on.  And it produces an encumbrance on the Williamsons. It's not suitable. So, when they go out in their Florida room and the sun sets – it now sets hours before because it casts a shadow.  And this is not suitable for what I think the association wants for its members." Tr. 184:9-16.  Mr. Laur further confirmed he defined "the surroundings" as the entire neighborhood of Surrey Park and that the Structure was not in "harmony" because of its size in comparison to other accessory structures in the neighborhood. Tr. 192:7-12.

[73] Tr.292:2-19.

[74] Tr. 292:5-18.  Mr. Riegel testified he gave verbal notice to Mr. Lehr that he would be completing construction and that his counsel's letter of October 15, 2019, advising the Riegels "will proceed accordingly", likewise informed CASP that construction would continue.  Tr. 293:1-13; RX 8.

14

matches the style and color of the Property and is attractive and appears well made.[75] Since construction, the Riegels have used the Structure primarily for storage.[76] The Structure houses sports equipment, lawn equipment, a tractor, a snow blower, and at least twenty (20) totes full of Christmas decorations.[77]

Standing at 17.5 feet tall from ground level to the peak of the roof, the parties agree the Structure is the largest "shed" within Surrey Park.[78] Per Mr. Hirt, the Structure is "so much different than every – anything else in Surrey Park[.]"[79] Mr. Hirt further testified that the Structure is "an order of magnitude larger than anything that had ever been built in Surrey Park."[80] Mr. Laur testified similarly, stating "[t]here is nothing close to this size, height, in the entire neighborhood."[81] CASP did not, however, present any evidence in support of these observations and beliefs.

---

[75] *See* PX 9; Tr. 366:14-367:3. Mr. Laur testified that the Structure is well built, and he has no complaints about its visual appearance, other than the height and overall size. Tr. 200:4-19. Mr. Riegel took great pride in the quality of the Structure's construction. Tr. 278:21-279:2.

[76] Tr. 251:12-13.

[77] Tr. 252:15-253:12.

[78] *See, e.g.*, Tr. 405:8-11 (Riegel) (admitting he did not locate any sheds as tall as the Structure). There has been some confusion about the height of the shed, but I accept Mr. Riegel's testimony at trial that it is 17.5 feet tall. Tr. 366:5-6.

[79] Tr. 56:10-18.

[80] Tr. 68:10-12.

[81] Tr. 155:21-22.

Evidence did confirm that the Structure is plainly visible from the Williamsons' patio and "Florida room."[82] But the property line between the Riegels and the Williamsons features a line of six-foot-tall shrubs and evergreen trees.[83] At most, the Structure blocks the partial view permitted by such shrubbery into the Riegels' yard and a portion of the Williamsons' view of the sky.[84]

Since the Structure was completed CASP has taken steps to ensure other outbuildings were reviewed and approved and to prevent future, similar outbuildings from being constructed. Mr. Hirt testified that, after this litigation commenced and in response to the Riegels' contention that other sheds were not pre-approved, he contacted certain homeowners to confirm approval.[85] And on October 21, 2019, CASP adopted written shed guidelines, through a majority vote of the Board.[86]

---

[82] Tr. 234:20-235:3, 239:1-9. I use the more colloquial "Florida room," although I appreciate the Williamsons now call it their "pool room." Tr. 236:10-14.

[83] *See* PX9.

[84] Tr. 240:22-241:13, 239:10-21. Mr. Williamson "believe[s] the shed detracts from [their] property" and he and his wife "were disappointed to see it so large and domineering." Tr. 237:11-13.

[85] Tr. 87:19-88:7.

[86] Tr. 80:24-81:9. The shed guidelines limit the maximum size of a shed to 200 square feet and establish a maximum height of ten feet. RX 25. The shed guidelines also explicitly reiterate the requirement to submit plans to the Committee for approval before construction. *Id.*

### D. Procedural History

On December 2, 2019, after the Structure was completed, CASP filed a petition against the Riegels to enforce the restrictions under Title 10, Section 348 of the Delaware Code, seeking declaratory and mandatory injunctive relief.[87] The Riegels initially moved to dismiss, but after briefing and argument, I issued a final report recommending that the motion be denied.[88] The Riegels answered on September 23, 2020, and trial was set first for January 12, 2021, then rescheduled to March 9, 2021.[89]

On January 21, 2021, CASP filed a motion for the appointment of a receiver for the Corporation.[90] Shortly thereafter, CASP filed a motion to compel the Riegels to appear for a deposition.[91] After the motions were fully briefed, I issued a final report on June 2, 2021, recommending that the motion to appoint a receiver be denied and that the Riegels be made available for deposition.[92] Regarding the former, I found I did not have a sufficient record before me to determine if the

---

[87] D.I. 1. The parties participated in expedited mandatory mediation under 10 *Del. C.* § 348, but it was unsuccessful. *See* D.I. 18.

[88] D.I. 7, 14, 15, 20-22.

[89] D.I. 25, 29, 33.

[90] D.I. 35.

[91] D.I. 38.

[92] D.I. 48.

appointment of a receiver was necessary and appropriate.[93] With trial scheduled for June 29, 2021, I stayed any exceptions; that stay is now lifted.

Ultimately, a one-and-a-half-day trial was held on June 29, 2021 and July 21, 2021.[94] Post-trial submissions were filed on September 24, 2021, at which time the matter was submitted for my consideration.[95] I then issued a draft report on December 30, 2021, to which both sides filed exceptions.[96] This is my final report.[97]

## II. Analysis

The restrictions at issue in this case are commonly referred to as architectural review covenants, in that they require prior review and approval of plans for improvements. These types of covenants are "neither new nor uncommon in Delaware" but they "must be carefully evaluated because their arguably subjective nature introduces the risk of arbitrary and capricious application."[98]

CASP bears the burden of proving the restrictions (1) are enforceable in that they "present clear, precise, and fixed standards of application," (2) were not

---

[93] *Id.*

[94] D.I. 61, 68.

[95] D.I. 74.

[96] *See* D.I. 76-77.

[97] This final report makes the same substantive findings as my draft report, except regarding standing, and the exceptions are primarily addressed in footnotes, providing responses and clarification as appropriate.

[98] *Lawhon v. Winding Ridge Homeowners Ass'n, Inc.*, 2008 WL 5459246, at *5 (Del. Ch. Dec. 31, 2008).

18

arbitrarily or capriciously applied in reviewing and rejecting the Riegels' plans, and (3) were violated by the Riegels.[99] CASP also bears the burden of proving entitlement to injunctive relief to remove the Structure and must show "(1) actual success on the merits of the claims; (2) that [CASP] will suffer irreparable harm if injunctive relief is not granted; and (3) that the harm to [CASP] outweighs the harm to the [Riegels if] an injunction is granted."[100]

The Riegels argue CASP cannot meet its burden of proof. The Riegels also challenge CASP's standing to enforce the restrictions and argue that this case is not ripe for adjudication. CASP bears the burden of proving standing and ripeness.[101] The Riegels have also asserted the affirmative defense of acquiescence, for which they bear the burden of proof.[102]

The burden of proof for these claims and defenses is by a preponderance of the evidence. "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe

---

[99] *Id.*

[100] *O'Marrow v. Roles*, 2015 WL 5714847, at *11 (Del. Ch. Sept. 30, 2015).

[101] *See Dover Historical Soc'y v. City of Dover Planning Com'n*, 838 A.2d 1103, 1109 (Del. 2003).

[102] *Tusi v. Mruz*, 2002 WL 31499312, at *4 (Del. Ch. Oct. 31, 2002).

that something is more likely true than not."[103]  "By implication, the preponderance of the evidence standard means that if the evidence is in equipoise," the party with the burden of proof loses.[104]

## A.     CASP has failed to prove standing to enforce the declaration.

I first address the threshold issue of standing.  "To establish standing, a plaintiff or petitioner must demonstrate first, that he or she sustained an 'injury-in-fact'; and second, that the interests he or she seeks to be protected are within the zone of interests to be protected."[105]  The Riegels concede that the Declaration granted standing to the Corporation to enforce the restrictions.  But they contest CASP's authority, arguing the right to enforce was not effectively transferred from the Corporation to the Cromptons and then to CASP.  In this final report, I have reconsidered the holding in my draft report and find that CASP has failed to establish standing by a preponderance of the evidence.

When a Delaware corporation dissolves, it goes through a three-year winding up process.[106]  As explained by Vice Chancellor Laster, after wind up, "the stockholders receive 'any remaining assets.' That is because stockholders are

---

[103] *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002) (citations and quotation marks omitted).

[104] *OptimisCorp v. Waite*, 2015 WL 5147038, at *55 (Del. Ch. Aug. 26, 2015).

[105] *Dover Historical Soc'y*, 838 A.2d at 1110.

[106] *See In re Altaba, Inc.*, 2021 WL 4705176, at *10 (Del. Ch. Oct. 8, 2021) (quoting 8 *Del. C.* § 278).

residual claimants. Hence they must stand at the back of the line, await the results of the winding up process, and receive what remains after creditors' claims have been paid."[107] This receipt is codified in 8 *Del. C.* § 281(b), which "provides that any assets that remain after the dissolved corporation has paid existing claims and provided for pending and future claims 'shall be distributed to the stockholders of the dissolved corporation.'"[108] Thus, I must answer two questions—was the right to enforce an asset of the Corporation and was it distributed to the Cromptons?

The assets of a dissolved corporation include not only physical property, but the corporation's vested and contingent rights.[109] I continue to find the right to enforce deed restrictions has value to the holder and is property and, more so, an asset within the context of winding up.[110]

As to the second question, I pause to better understand what it means to distribute. "When interpreting a statute, the court's task is to 'ascertain and give effect to the intent of the legislature.' If the statute uses unambiguous language, then

---

[107] *Id.* at *10.

[108] *In re Krafft-Murphy Co., Inc.*, 82 A.3d 696, 706 (Del. 2013).

[109] *Id.* at 704 ("Assets—*i.e.,* 'property'—of a dissolved corporation include both vested and contingent rights.") (citations omitted).

[110] In their exceptions, the Riegels argue that the draft report "improperly conflates the term 'property' under [8 *Del. C.* § 278, 279] with the term 'assets' in 8 *Del. C.* § 278." D.I. 81, p.15. I clarify herein that the right to enforce the restrictions was both property and an asset of the Corporation, based on my finding that the right to enforce has value to the holder of that right. In so holding, I reject the Riegels' argument that the right cannot quality as an asset because it "has no money value[.]" *Id.*, p.19.

the court must adhere to its plain meaning."[111]  Because "distributed" is not defined in the statute, I turn to a dictionary definition.  Black's Law Dictionary defines distribute as follows: "To apportion; to divide among several. 2. To arrange by class or order. 3. To deliver. 4. To spread out; to disperse."[112]  Thus, the question is whether CASP presented evidence making it more likely than not that the Corporation distributed the right to enforce to the Cromptons by apportioning, delivering, or dispersing it to them.  I find the answer is "no."

CASP relies solely on the Assignment to prove that the right to enforce was distributed to the Cromptons.  The Assignment provides "as part of the dissolution" of the Corporation, the right to enforce the restrictions "passed to and devolved to the stockholders" of the Corporation.[113]  CASP argues this passing or devolution was by operation of law and confirmed in the Assignment.  I disagree.

Although Vice Chancellor Laster in *In re Altaba* uses the passive phrase "the stockholders receive" rather than a more active phrase such as "the corporation distributes" in portions of his discussion of the winding up process, I agree with the Riegels that this should not be read to support automatic devolution of assets.  First, it is a stretch too far from dicta.  Second, it conflicts with the need for post-

---

[111] *In re Altaba, Inc.*, 2021 WL 4705176, at *19 (citations omitted).

[112] *Distribute*, Black's Law Dictionary (11th ed. 2019).

[113] RX2.

dissolution receiverships expressed in our statutory scheme. And, third, "distribute" as defined implies some affirmative action. As such, CASP cannot rely solely on the fact of dissolution to prove that the right to enforce devolved to the Cromptons. Nor would the Assignment qualify as such affirmative action because it was more than four years after dissolution.

The next question is whether the language in the Assignment that the right "passed to" the Cromptons is sufficient to prove that, more likely than not, the right was distributed to the Cromptons by or before January 13, 1974 (the end of the winding up process). I think not. There is no evidence regarding how such passing occurred. The Assignment is, at best, vague on this point. And the Declaration contained a written assignment clause; if the right to enforce was passed or distributed to the Cromptons during the winding up process, one would expect to see a written assignment in compliance therewith.[114] Without anything demonstrating how the right to enforce was passed to the Cromptons, the Cromptons were without authority to transfer that right through the Assignment. They could not transfer something they did not own. For these reasons, CASP has failed to demonstrate standing to enforce the deed restrictions.

\* \* \*

---

[114] *See also* RX9, RX15 (reflecting the written transfer of assets one day before dissolution).

23

Although standing is a gatekeeping issue, I address the parties' remaining issues in the interest of judicial economy and efficiency should additional exceptions be filed.

**B.     The parties' dispute is ripe for adjudication.**

In every case before this Court, "[t]he issue involved in the controversy must be ripe for judicial determination."[115]  The Court will not exercise jurisdiction until a controversy has "matured to a point where judicial action is appropriate."[116]

The Riegels argue CASP failed to prove ripeness because the Board did not vote on the Riegels' revised plans.  I agree it is unclear whether the Board took action on the revised plans, but, at the least, the Committee did.  I find a rejection by the Committee is sufficiently definite to ripen this matter for judicial action.[117,118]

---

[115] *Rollins Int'l, Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 663 (Del. 1973).

[116] *Stroud v. Milliken Enterprises, Inc.*, 552 A2d 476, 480 (Del. 1989).

[117] *Cf. Seabreak Homeowners Assoc. v. Gresser*, 517 A.2d 263, 267 (Del. Ch. 1986), *aff'd*, 538 A.2d 1113 (Del. 1988) ("The delegation of so-called 'architectural review' powers to a committee is a practice commonplace in Delaware and throughout the country.").

[118] This finding remains the same from my draft report, to which the Riegels took exception.  The Riegels argue that this action is not ripe because CASP did not prove that the Board acted on the Riegels' revised plans.  I disagree.  Ripeness does not require such technicalities.  "A ripeness determination requires a common sense assessment of whether the interests of the party seeking immediate relief outweigh the concerns of the court in postponing review until the question arises in some more concrete and final form."  *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1217 (Del. 2014) (cleaned up).  Under this lens, I find the parties' dispute ripe for review.

## C.    CASP has not acquiesced to violations of the restrictions.

The final gatekeeping issue is whether CASP has acquiesced to violations of the restrictions and, as such, waived the ability to enforce them. "It is clear that when a party acquiesces in violations of a deed restriction, the restriction may become unenforceable.  But minor violations do not support a claim of abandonment."[119] "[W]hen due to inadvertence or a good faith non-enforcement decision, a prior failure to enforce does not preclude future enforcement of the same restrictive covenant."[120]   Thus, the Riegels bear the burden of presenting "sufficiently compelling facts to show [CASP] intended to abandon the right to enforce the restriction[s] . . . ."[121]

Before I address the evidence presented by the Riegels, I note the Declaration contains a non-waiver clause providing "[f]ailure by said grantors or any land owner

---

[119] *Henderson v. Chantry*, 2003 WL 139765, at *3 (Del. Ch. Jan. 10, 2003) (citations and internal quotation marks omitted).

[120] *Dolan v. Villages of Clearwater Homeowners' Ass'n, Inc.*, 2005 WL 2810724, at *4 n.19 (Del. Ch. Oct. 21, 2005) (addressing *Brandywine Hills Cmty. Assoc. v. T. Bruce Wilmoth Constr. Co.*, 1995 WL 767336, at *10 (Del. Ch. Dec. 21, 1995)).

[121] *Id.   See also Brandywine Hills*, 1995 WL 767336, at *9-*10 (rejecting summary judgment because the moving party did not convince the Court that the association "in its alleged desuetude of power, knowingly and willingly waived or abandoned its power to enforce the Restrictions, either specifically as to some and not others or in their entirety"). The Riegels argue for the first time in their exceptions that their acquiescence argument should be viewed under either a waiver or abandonment lens.  But their post-trial briefing focused primarily on widespread abandonment. *See* D.I. 74, p.16-18.  By failing to argue waiver in their post-trial briefing, the Riegels waived such argument. *Emerald Partners v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief.").

25

to enforce any restriction, condition, covenant or agreement herein contained shall in no event be deemed a waiver of the right to do so thereafter."[122]  Although CASP argues this clause bars any claim of acquiescence, I disagree.  As recognized by then-Vice Chancellor Steele a non-waiver clause is a "*contractual* right to insist failure to enforce does not constitute waiver."[123]  The Court is not, however, estopped from considering evidence of alleged waiver and weighing the "right to insist" against the evidence presented.

But any challengers—here, the Riegels—must meet a high burden.  To prevail, the Riegels had to demonstrate, by a preponderance of the evidence, that the presence of unapproved structures is pervasive throughout Surrey Park and CASP's allowance of unapproved structures reflects a total and absolute abandonment of CASP's right to require the submission of plans for pre-approval.[124]  The Riegels fell short.

By Mr. Riegel's count, the 221-home community of Surrey Park has 51 "unapproved" sheds, 48 "unapproved" decks and additions, and 20 expressly

---

[122] PX 1.

[123] *Brandywine Hills*, 1995 WL 767336, at *9 (emphasis in original).

[124] *See Tusi*, 2002 WL 31499312, at *3.  *See also Henderson*, 2003 WL 139765, at *3 (finding five unchallenged violations of the restriction at issue did not "represent a widespread, general, and pervasive violation of" the restriction "such that the character" of the subdivision "has clearly changed").

approved sheds, decks, or additions.[125]  Even assuming Mr. Riegel is correct that unsupported equals unapproved, I find the lack of approval is not so pervasive or systemic that it is more likely than not CASP has totally and absolutely abandoned architectural review and preapproval of sheds, decks, and additions.  Thus, the Riegels have failed to prove their defense of acquiescence by a preponderance of the evidence.[126]

---

[125] D.I. 74 (citing RX 13, 33).  Anything unsupported in the written record, the Riegels argue, was not approved, and supports their acquiescence claim.  The Riegels point to the Declaration, which they contend requires CASP to "permanently preserve Architectural Review approvals".  D.I. 74, n.12.  The Declaration does provide that plans be approved in writing and the final approval be "lodged permanently with said grantors or their designees." RX 1.  But a failure to "lodge[] permanently" is a far cry from a systemic failure to enforce.  *Cf. Henderson*, 2003 WL 139765, at *3 (finding violations of restrictions not at issue "cannot support a waiver or abandonment claim with respect" to the restriction at issue).

[126] This finding remains the same as my draft report, to which the Riegels took exceptions. The Riegels argue that I applied an "incorrectly heightened legal standard" by holding the Riegels to the burden of proving "a total and absolute waiver[.]"  D.I. 81, p. 29.  The Riegels further argue that they "presented uncontroverted evidence at trial establishing that there had never been one, single, legally valid approval of any Sheds, Fences, or Other Structures in Surrey Park over a 45+ year period" and "that there is no evidence supporting the proposition that the Committee or a Chairperson of the Committee ever granted approvals to over eighty percent (80%) of all of the Sheds, Fences, and Other Structures installed in Surrey Park in the prior 4½ decades."  *Id.*, p. 30.  I disagree.  The Riegels conceded in their post-trial briefing, as reflecting in RX13 and RX33, at least 20 sheds, decks, or additions were approved by the Committee or its chair.  D.I. 74, p.17.  Further, I found testimony by CASP's officers regarding enforcement efforts credible.  Yet the Riegels argue that I should be looking at the prevalence of unapproved structures more strictly, arguing without support "the lowest 'prevalent' threshold argument possible would be 75%, which was satisfied under the circumstances." *Id.*, p.33.  The test is not so rigid—rather, the evidence must demonstrate abandonment or acquiescence "so general as to indicate either a change in the neighborhood or a clear intent on the party of the property owners generally to abandon the original plan."  *Henderson v. Chantry*, 2003 WL 139765, *3 (Del. Ch. Jan.

**D.    The restrictions are unenforceable and were arbitrarily applied.**

I arrive at the final step—whether CASP has met its burden to prove the restrictions are enforceable and were not arbitrarily applied to the plans submitted by the Riegels.  I find CASP fails in both respects, although either would suffice to reject their claims.

1.    *The restrictions are unenforceable.*[127]

CASP, alone or through the Committee, can only enforce restrictions that are "clear, specific, and reasonable" not those that are "overly vague, imprecise, or so unclear as to not lend itself to evenhanded application[.]"[128]  The three restrictions invoked to reject the Riegels' plans are the latter.

---

10, 2003). On this record, I find the Riegels failed to meet this standard (assuming for purposes of this discussion CASP had standing to so enforce).

[127] I continue to so find despite CASP's exceptions, which should be overruled.  CASP frames the questions presented in its exceptions as (1) "are deed restrictions that specifically require the consideration of the 'height' of a detached shed prior to approval, sufficiently objective, clear, specific and reasonable to be enforceable in a neighborhood that has since its inception in 1964, never contained a shed that was higher than 10 [feet]" and (2) "is 'height' an objective measure when [the Structure] is 75% taller than any other shed that exists in Surrey Park?"  D.I. 79. *But see* D.I. 90 (changing 75% to 76%).  The premise for these questions is, however, flawed. "Height" is but one attribute that must be disclosed in a plan submitted in compliance with the Declaration. PX 1. It is not an independent restriction—rather the restrictions were phrased much broader as suitability/desirability, harmony, and outlook. *Id.* Further, it is difficult to accept CASP's 75-76% quantification based on the slim record developed at trial.  I continue to find the restrictions unenforceable as written for the reasons provided herein.

[128] *Seabreak*, 517 A.2d at 269.  *See also Canal Corkran Homeowners Assoc., Inc. v. Petrone*, 2017 WL 1450168, at \*4 (Del. Ch. Apr. 21, 2017) (explaining "if the language of a restrictive covenant is so vague that it does not provide 'clear, precise, and fixed standards of application,' . . . the restriction will be deemed unenforceable by the court").

28

The Declaration authorizes rejection of plans that "are not suitable or desirable, in [CASP or the Committee's] opinion, for the aesthetic or other reasons" with the right to take into account "the suitability of the proposed building or other structure and of the materials of which it is to be built, to the site upon which is proposed to erect the same, the harmony thereof with the surroundings and the effect of the building or other structure, as planned, on the outlook for the adjacent or neighboring property."[129]  These three inquiries—suitability/desirability, harmony, and outlook—are overly vague, imprecise, and unclear as written.

"First, restrictions based on abstract aesthetic desirability are impermissible. An individual's, or a committee's, opinion of what is tasteful does not constitute an objectively fair and reasonably ascertainable standard."[130]  This dooms the suitability/desirability factor in the Declaration, which is expressly tied to aesthetics subject to CASP's or the Committee's subjective opinions.

Second, "the term 'outlook' has no built-in, objective standards that would enable it to be applied in an evenhanded manner or to be used as a guideline by lot owners in designing their residences."[131]  The Declaration permits CASP to consider "the effect of the building or other structure, as planned, on the outlook for the

---

[129] RX 1.

[130] *Lawhon*, 2008 WL 5459246, at *5.

[131] *Seabreak*, 517 A.2d at 268.

adjacent or neighboring property."[132] I find this restriction is vague, imprecise, and lends itself to arbitrary application; as such it is unenforceable as written.

Third, and finally, harmony restrictions, like the one here, have only been found enforceable "when that community possesses a 'sufficiently coherent visual style' enabling fair and even-handed application."[133] Testimony at trial confirmed there are at least five (5) different architectural styles within Surrey Park. There are also several different types of facades, utilizing different building materials. There are also many different kinds of accessory buildings, including gazebos and pool houses, throughout the community. Surrey Park is not sufficiently coherent in visual style to provide the Riegels or other residents with an objective standard for community visual harmony.[134]

I find all three restrictions relied upon to reject the Riegels' plans are unenforceable. They fail to provide "sufficient notice as to what constitutes appropriate conduct" by the homeowners in Surrey Park.[135] "[F]undamental fairness requires that a property owner be given notice, whether written or *de facto*, of the

---

[132] PX 1.

[133] *Lawhon*, 2008 WL 5459246, at *5.

[134] At best, the restriction may be enforceable with a narrow definition of "surroundings" to include only the applicant's lot. No one has argued for this interpretation; it would, however, further support judgment for the Riegels, because the Structure matches the style of the Property.

[135] *Canal Corkran Homeowners Assoc., Inc.*, 2017 WL 1450168, at *4.

30

specific requirements to which the[ir] building plans must conform for those plans to receive . . . approval."[136]  As explained by Vice Chancellor Noble, "[a]dequate notice means communicating the demands of compliance; whether that be a 10-foot-setback or a certain architectural style.  Restrictive covenants which are too vague to serve these functions of notice and fairness are unenforceable."[137]  CASP failed to meet its burden of proving that the restrictions are clear, specific, and provided sufficient notice and a reasonable standard for its enforcement actions.[138]

---

[136] *Seabreak*, 517 A.2d at 270 (citations omitted).

[137] *Lawhon*, 2008 WL 5459246, at *5 (citations omitted).  The architectural review restrictions in *Lawhon* were similar to the ones at issue here.  But, despite the Court's helpful analysis of enforceability, the Court was not asked to decide whether the restrictions were unenforceable as written. *See id.* at *4 (explaining the questions presented were whether (1) the homeowners association had the power to enforce, (2) enforcement was arbitrary and capricious, or (3) enforcement was barred by laches, equitable estoppel, or waiver). *Cf. id.* at *7 (rejecting the power to enforce argument and noting the review provision provided adequate notice of the proper procedure to seek approval, meeting the "minimum requirements" necessary to vest review power, but not addressing enforceability of the aesthetic, harmony, and outlook standards articulated for such review); *Dawejko v. Grunewald*, 1988 WL 140225, at *5 (Del. Ch. Dec. 27, 1988) (addressing the "minimal standards" required for an architectural review covenant to convey review powers, but remaining silent as to the enforceability of suitability, harmony, and outlook standards for such review).

[138] *See Campanelli v. Coffee Run Condo. Council*, 2021 WL 3120198, at *6-*7 (Del. Ch. Jul. 23, 2021) (finding architectural review provisions imprecise, vague, and unclear); *O'Marrow*, 2015 WL 5714847, at *9 (finding a restriction requiring all outbuildings to be "similar in color and construction to the existing barns and buildings" was "too vague, unclear, and ambiguous to be enforced"); *Serv. Corp. of Westover Hills v. Guzzetta*, 2009 WL 5214876, at *6 (Del. Ch. Dec. 22, 2009) (finding deed restrictions that "provide no guidance as to how [the association] is to consider 'the suitability of the proposed building or other structure,' the 'materials of which it is to be built,' the site where it is 'proposed to erect the same,' or 'the effect of the building or other structure . . . on the outlook from the adjacent or neighboring property[,]'" unenforceable and "unreasonable as a matter of law"); *Benner v. Council of Narrows Ass'n of Owners*, 2014 WL 7269740, at *9 (Del. Ch.

### 2. *The restrictions were arbitrarily applied.*[139]

Even if the restrictions were enforceable, I find they were arbitrarily applied to the Riegels.[140] Although architectural review powers are commonplace, they are particularly susceptible to arbitrary, capricious, and unreasonable application.[141] Accordingly, these powers must be applied in a reasonable manner and "any doubts as to its reasonableness must be resolved in favor of the landowners."[142] CASP "must show [it or the Committee] applied the relevant standards on a reasoned and

---

Dec. 22, 2014), *adopted* (Del. Ch. 2015) (finding deed restrictions "unenforceable under Delaware law because of the absence of any clear and precise standard governing the review.").

[139] I continue to so find despite CASP's exceptions, which should be overruled. CASP frames the questions presented in its exceptions as (1) "[w]as CASP justified in concluding that a structure that is 75% taller than any other shed in Surrey Park not suitable, or desirable and not in harmony with its surroundings" and (2) "[a]re the surroundings to which [the Structure] must be in harmony with under the deed restrictions limited to just the architectural style of their home, or can these surroundings include the other sheds in Surrey Park given that [the Structure] is 75% taller than any other shed in Surrey Park?" D.I. 79. *But see* D.I. 90 (changing 75% to 76%). Initially, as already stated, it is difficult to accept CASP's 75-76% quantification based on the slim record developed at trial. And, if the field for comparison is the entire neighborhood, I find it would be unreasonable not to include all outbuildings in my review. When looking at all outbuildings, there are a number that compare to or dwarf the Structure in size, distinguishing this case from those like *Christine Manor Civic Ass'n v. Gullo*, 2007 WL 3301024, *2 (Del. Ch. Nov. 2, 2007). *See, e.g.*, RX30. I continue to find the restrictions were arbitrarily applied for the reasons provided herein.

[140] I engage in this analysis for the sake of efficient judicial review and recognizing some of my colleagues have upheld language similar to that used in the Declaration. *See, e.g.*, *Christine Manor Civic Ass'n v. Gullo*, 2007 WL 3301024, at *1 (Del. Ch. Nov. 2, 2007) (holding that similar "terms-even though sometimes they may frustratingly lack desired specificity-are generally enforceable").

[141] *Seabreak*, 517 A.2d at 268.

[142] *Id.*

nonarbitrary basis (not on subjective aesthetics)" when rejecting the Riegels' revised plan.[143]

The Riegels' revised plan was rejected primarily because of the Structure's height—17.5 feet—and outlook concerns for the Williamsons' property. But, during the application process, CASP or the Committee indicated that a 10- or 12-foot structure would have been acceptable. CASP has failed to demonstrate how a 10-or 12-foot structure would be more suitable, desirable, or in harmony with the neighborhood than the Structure. Further, testimony confirmed that the outlook from the Williamsons' property would be similarly affected if the Structure was 10 or 12 feet tall. And CASP failed to present evidence in support of its contentions that the Structure is unlike other outbuildings in the neighborhood in terms of its overall size and placement in relation to the Williamsons' property.[144] Setting aside subjective concerns about the Structure's height and effect on the neighboring property, the Structure is in harmony with the immediate surroundings—the Riegels' home (the Property). Further, all parties agree the Structure was well-constructed. On this record, I find the rejection of the Riegels' revised plans was arbitrary.

---

[143] *Wild Quail Golf & Country Club Homeowners' Ass'n, Inc. v. Babbitt*, 2021 WL 2324660, at *5 (Del. Ch. June 3, 2021).

[144] *But see* RX 11 #16 (shed with windows), #18 (shed with windows, porch, and second level),

### E. The Riegels are entitled to attorneys' fees and court costs.

This action was brought under 10 *Del. C.* § 348. Section 348 cases are subject to prevailing party fee shifting: "[t]he non-prevailing party at a trial held pursuant to [Section 348] must pay the prevailing party's attorney fees and court costs, unless the court finds that enforcing this subsection would result in an unfair, unreasonable, or harsh outcome."[145]

I find the Riegels are the prevailing parties. The Riegels have not, however, submitted an affidavit of costs under Court of Chancery Rule 88, nor has CASP had the opportunity to argue that shifting in whole or in part "would result in an unfair, unreasonable, or harsh outcome." The Riegels shall submit their Rule 88 affidavit within twenty (20) days of this report becoming an order of the Court and CASP may respond twenty (20) days after such filing.

## III. Conclusion

For these reasons, I find the Riegels' exceptions to my draft report should be granted in part and denied in part; CASP's exceptions should be denied. I find judgment should be entered in favor of the Riegels and further briefing should commence regarding fee shifting.

---

[145] 10 *Del. C.* § 348(e).

This is my final report and exceptions may be filed under Court of Chancery Rule 144. The stay of exceptions to any interim rulings is hereby lifted.

**IT IS SO ORDERED.**